09-4152-cr
United States v. Hsu

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term, 2011

(Submitted: October 14, 2011      Decided: February 17, 2012)

Docket No. 09-4152-cr

———————————

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

NORMAN HSU,

*Defendant-Appellant*.

———————————

B e f o r e:

WINTER, LYNCH, and CARNEY, *Circuit Judges*.

———————————

Defendant pled guilty to several counts of mail and wire fraud, was convicted by a

jury of violations of federal campaign finance law, and was sentenced to 292 months in

prison in the United States District Court for the Southern District of New York (Victor

Marrero, *J*.).  He appeals the resulting judgment of conviction on various grounds,

including that the loss calculated for purposes of the Sentencing Guidelines improperly

included promised returns on Hsu's victims' investments.  We affirm the district court's

loss calculation and hold that in the context of Ponzi schemes, intended loss can include reinvested earnings even when those "earnings" are the illusory predicate upon which the Ponzi scheme rests.

Affirmed.

————————

DONNA R. NEWMAN, Buttermore Newman Delanney & Foltz, LLP, New York, NY, *for Defendant-Appellant*.

MICHAEL BOSWORTH, KATHERINE POLK FAILLA, Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

————————

GERARD E. LYNCH, *Circuit Judge*:

Defendant Norman Hsu was indicted on several counts each of (1) mail fraud, in violation of 18 U.S.C. § 1341; (2) wire fraud, in violation of 18 U.S.C. § 1343; and (3) campaign finance fraud, in violation of 2 U.S.C. §§ 441f and 437g(d)(1)(A). On May 7, 2009, in the United States District Court for the Southern District of New York (Victor Marrero, *J.*), Hsu pled guilty to the mail and wire fraud counts, all of which relate to a Ponzi scheme that defrauded victims of tens of millions of dollars from at least 2000 until 2007. He was then convicted after trial by jury of the campaign finance fraud counts. The district court sentenced Hsu to a guidelines sentence of 292 months in prison for both the Ponzi scheme and campaign finance crimes.

2

On appeal, Hsu challenges his guilty plea, conviction, and sentence. First, he argues that two of the ten counts to which he pled guilty were barred by the statute of limitations. Second, he challenges, for the first time on appeal, the admission of certain testimony regarding his Ponzi scheme and other criminal activity at his trial for violating campaign finance laws. Third, with respect to his sentence, Hsu argues that the district court (1) miscalculated the loss attributable to his Ponzi scheme; (2) failed to consider or appropriately weigh mitigating factors regarding, inter alia, his remorse and mental health; and (3) violated his Sixth Amendment rights by failing to appoint new counsel for sentencing.

We affirm the district court in all respects, and hold that (1) Hsu waived any statute of limitations challenge to the indictment by pleading guilty; (2) the district court's admission of the Ponzi scheme evidence was not plain error; (3) the district court did not err by calculating the intended loss amount under the Guidelines to include the loss of putative profits that victims reinvested in Hsu's Ponzi scheme; (4) the district court did not abuse its discretion when weighing the factors relevant to Hsu's sentence; and (5) under the circumstances of this case, the appointment of a new attorney for sentencing was not required.

## BACKGROUND

### I. **Facts**

In view of the defendant's convictions, we summarize the facts in the light most favorable to the government.  United States v. Riggi, 541 F.3d 94, 96 (2d Cir. 2008).

In or before 2000, Hsu devised a scheme whereby he invited investment in two entities that he purported to lead as Managing Director: Components Ltd. and Next Components Ltd. ("the Companies").  Hsu told investors that the Companies were engaged in the lucrative and low-risk business of providing short-term financing to small, high-end retail companies.  In fact, there was no such business, as there were no such Companies: Hsu had invented them as the seemingly legitimate front for what turned out to be a multimillion-dollar Ponzi scheme.

Hsu's scheme was a variation on the familiar fraud.  See Cunningham v. Brown, 265 U.S. 1, 7 (1924) (describing "the remarkable criminal financial career of Charles Ponzi").  In a typical Ponzi scheme, the schemer will "use[] the investments of new and existing customers to fund withdrawals of principal and supposed profit made by other customers."  In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 232 (2d Cir. 2011) ("Madoff").  Hsu's variation was to provide investors with post-dated checks issued by one of the Companies in the amount of the investor's principal plus a "guaranteed" return on that investment, usually, on an annualized basis, of 60%.  Sometimes investors would immediately cash the checks when they became due.  Frequently, though, they would

4

"roll over" their investment, thereby reinvesting the original principal plus accumulated gains in anticipation of further returns that would accrue during the next cycle.

In 2005, Hsu's fraudulent activities expanded to the world of campaign finance, specifically in his connection to campaigns for candidates for the U.S. presidency and both houses of the U.S. Congress. Hsu became a "bundler" on behalf of several prominent candidates. A bundler is a donor who has given the maximum legal amount to a preferred candidate and convinces friends to do likewise, channeling the "bundle" of donations to the candidate's campaign. Hsu was a legitimate bundler in some instances, but in others he committed fraud by recruiting "straw donors," or individuals recruited to donate to campaigns only to be reimbursed by Hsu after the fact.

Hsu's investment and campaign schemes overlapped. He used political connections created by his campaign fundraising to create an appearance of legitimacy useful in recruiting victims to his investment scam, and used the illusions of successful investments to recruit his investors as campaign "donors." Six of the ten government witnesses testified that they both invested in Hsu's various deals and made donations to various candidates at Hsu's behest, and that Hsu subsequently reimbursed them for their donations.

Hsu's various schemes ended when he was arrested in September 2007 on an outstanding 1992 California warrant for absconding after pleading nolo contendere to

5

charges in connection with an earlier, unrelated criminal scheme.[1]  After his arrest was widely reported in the press, his investors rushed to cash the last postdated checks they had received, most of which were returned for insufficient funds.  When the panic surrounding Hsu's arrest made it impossible to attract new capital infusions from current or future investors, the scheme collapsed.  See Madoff, 654 F.3d at 232; see also Eberhard v. Marcu, 530 F.3d 122, 132 n.7 (2d Cir. 2008) (describing typical Ponzi scheme "where earlier investors are paid from the investments of more recent investors  . . . until the scheme ceases to attract new investors and the pyramid collapses").  The ensuing investigation revealed the extent of Hsu's scheme, including his various campaign finance frauds.  The post-dated checks held by Hsu's victims totaled more than $100 million; the net losses to the investors as a class amounted to more than $20 million.

II.  **District Court Proceedings**

On December 9, 2008, Hsu was indicted on fourteen counts.  Counts One through Five charged instances of mail fraud in connection with the Ponzi scheme, including one transaction that occurred in 2000.  Counts Six through Ten charged wire fraud crimes in connection to the same scheme, including one count associated with the same 2000 transaction.  Counts Eleven through Fourteen charged various violations of campaign finance laws.

---

[1] Hsu had originally turned himself in on August 31, 2007, but thereafter again fled the state and failed to appear at a bail reduction hearing.

6

On the eve of trial, Hsu pled guilty to the Ponzi scheme counts, without a plea agreement. Immediately following the allocution, the government asked the court to allow testimony from Hsu's Ponzi scheme victims at the trial of the remaining campaign finance fraud charges. Initially, the district court expressed some concern regarding this request, stating its "inclination . . . to say that if you have more than a couple [of witnesses], . . . it may be excessive. If all you are trying to bring in is [Federal Rule of Evidence] 404(b) evidence from victims, then more than a handful would not be necessary." Hsu's counsel agreed that "it is appropriate for evidence to come in as to the Ponzi scheme as it relates to why contributions were made and why contributions were made in a particular manner," but stated that he "would object to witnesses testifying that there was a Ponzi scheme going on and people were involved in it if it has no bearing on the issue of the political contributions." The government clarified that it would call four such witnesses. The government argued that this testimony was relevant to show motive, because the "straw donations were . . . orchestrated by the defendant so that people would invest in the Ponzi scheme." In other words, Hsu used his campaign activities to entice investors to participate in his scheme. Hsu did not object to the testimony, either during the pretrial discussion or subsequently at trial. The court agreed "conceptually" that the government's proposed testimony would be admissible, but specifically warned against the risk of creating undue prejudice by calling "the proverbial little old ladies" who would testify "in tears" regarding their losses.

7

Four of the ten witnesses who testified at trial – Yau Cheng, Martin Waters, Steven Kwon, and Nicole Chorvat – were Ponzi-scheme victims but not political contributors. In addition to testimony regarding the nature of the Ponzi scheme, these witnesses also mentioned aspects of Hsu's lavish lifestyle and explained how they learned of Hsu's California conviction.

The testimony of those witnesses revealed a weakness in the government's theory of a connection between the Ponzi scheme and Hsu's political activity, in that three of the four witnesses – Cheng, Waters, and Kwon – had invested in Hsu's scheme before they knew of his involvement in politics. Although Hsu's attorney never objected to the inclusion of this testimony, the district court sua sponte expressed concern that each witness had

> given pretty much the same story concerning their investment into the [P]onzi scheme, their making a contribution at Mr. Hsu's request. But each of them has indicated that he did not ask them to reimburse them, in fact. So, so far, this is all background. My concern is . . . that if this is all you're going to continue to bring in, it's going to be cumulative, and if you don't start connecting the dots between that and violations of the campaign laws, I don't see where this is going.

After the government explained that the next witness, Chorvat, would testify that Hsu's political connections served to "cement her trust in [Hsu]," the district court allowed the testimony, but instructed the government that it would "have to make an extraordinary

8

case for more" such testimony. After Chorvat's testimony, the jury heard no other Ponzi-victim witnesses.

The jury returned a verdict of guilty on all four counts of campaign finance fraud. Soon after the verdict, Hsu began writing letters to the court expressing dissatisfaction with his retained trial counsel. His causes for dissatisfaction included "woefully inadequate" filings – including failed motions for the appointment of a receiver who would calculate the extent of the losses – and general "ineffective" representation at trial that stemmed from counsel's overall defense strategy. In his letters, Hsu requested the appointment of new counsel for post-trial proceedings. The district court denied those requests.

## III. **Sentencing**

Prior to sentencing, Hsu expressed remorse, outlined his contributions to society, and argued that his history of depression all militated against a harsh sentence. He also argued that the proper estimate of loss was the amount of restitution that Hsu owed his victims, or the aggregated losses of the losing investors.

The government disagreed in all respects, arguing that Hsu's conduct could not be mitigated either by his previous or ongoing good deeds or his recently diagnosed depression. The government also argued that the losses associated with Hsu's scheme were between $50 million and $100 million. The government arrived at this figure by adding the total amounts reflected on the faces of all outstanding checks held by Hsu

investors, then subtracting from that total the return that the final round of checks promised to pay.

The district court agreed for the most part with the government. The court found that Hsu's pleas for leniency were "not uncommon" in white-collar criminal contexts where defendants lead "a double life" of "outward rectitude" while simultaneously engaging in criminal activity. The district court also dismissed Hsu's claims that his recently diagnosed depression warranted a downward departure in sentencing, rejecting as incredible the argument that Hsu's depression caused his crimes. With respect to the loss calculation, the district court credited the government's theory of loss, finding that the "very method by which Mr. Hsu was able to perpetuate his fraudulent scheme" depended on his ability to inflate the perceived earnings year after year, "as part of a malicious effort to maintain their confidence and lure other victims." Finding a guidelines range of 292-365 months, the district court sentenced Hsu to 240 months on each of the ten mail and wire fraud counts, to run concurrently with each other, and 52 months on each of the four of the campaign finance counts, to run concurrently to each other but consecutive to the mail and wire fraud counts. The entire sentence of 292 months was made to run concurrently with his previous California sentence of 36 months.

**DISCUSSION**

On appeal, Hsu challenges his guilty plea to the Ponzi scheme, his conviction after jury trial for his violations of campaign finance laws, and his sentence for both.

## I. **Guilty Plea: Statute of Limitations**

In a supplemental pro se brief not endorsed by his appellate counsel, Hsu contests his conviction on Counts One and Six, the charges relating to the 2000 transaction, arguing that the statute of limitations had run on those counts and that he therefore could not plead guilty to them.[2]  However, "[i]t is well settled that a defendant's plea of guilty admits all of the elements of a formal criminal charge, and, in the absence of a court-approved reservation of issues for appeal, waives all challenges to the prosecution except those going to the court's jurisdiction."  Hayle v. United States, 815 F.2d 879, 881 (2d Cir. 1987) (internal citation omitted).  It is also well established that "the running of the limitations period does not defeat jurisdiction."  United States v. Walsh, 700 F.2d 846, 855 (2d Cir. 1983).  Thus, assuming arguendo that, at the time of the indictment, the

_____

[2] In the same pro se supplemental brief, Hsu argues that the government withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).  Specifically, Hsu asserts that the government withheld (1) e-mails that would have shown Hsu's insistence that donations made in anticipation of reimbursement were illegal, and (2) bank records that would have impeached a government witness by showing that the witness did not, contra her testimony, lose money by investing with Hsu.  Neither claim has merit, as there is no evidence that any such records exist.  If they do exist, Hsu was aware of them, and was in a position to subpoena them for trial.  Evidence is not "suppressed" within the meaning of Brady "if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence."  United States v. Paulino, 445 F.3d 211, 225 (2d Cir. 2006) (internal quotation marks omitted).

limitations period had run on two of the counts, Hsu's plea of guilty waived the statute-of-limitations defense.

## II. **Trial: Evidentiary Arguments**

Hsu also challenges the admission at trial of evidence relating to his Ponzi scheme and California convictions. Because Hsu did not raise this objection before the trial court, we review it for plain error. See United States v. Edwards, 342 F.3d 168, 179 (2d Cir. 2003). This standard gives us discretion to "correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Marcus, 130 S. Ct. 2159, 2164 (2010) (internal quotation marks and brackets omitted).

Hsu's argument fails to satisfy this standard. The admission of the challenged evidence, if error at all, was certainly not "plain error affecting [Hsu's] substantial right[s]." Fed. R. Evid. 103(e).

Under Federal Rule of Evidence 404(b)(1), evidence of a defendant's "crime[s], wrong[s], or other act[s] is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." In other words, evidence that a defendant committed crimes beyond those presented to the jury is

12

not admissible to show that the defendant is a bad person who is therefore likely to be guilty of the crimes charged.

But the Rule does not flatly prohibit the admission of such evidence. To the contrary, the Rule expressly allows the receipt of evidence of other crimes for a variety of other purposes. See Fed. R. Evid. 404(b)(2) (making such evidence "admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"). We have previously adopted the "inclusionary" rule that other crimes evidence is admissible for any purpose for which it is relevant, except to support the prohibited inferences of bad character or propensity to commit crimes. See, e.g., United States v. LaFlam, 369 F.3d 153, 156 (2d Cir. 2004). Moreover, we have emphasized that evidence of criminal behavior may be admissible as direct evidence of the crime charged "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted).

Here, the government offered a legitimate rationale for the relevance of the evidence of Hsu's Ponzi scheme at the trial of the campaign finance fraud charges. The government argued that the evidence was admissible because Hsu's schemes were connected: the evidence could be read by a jury as suggesting that Hsu used his Ponzi

13

investors as a source of campaign contributions, and used the connections to politicians to burnish his reputation for respectability so as to recruit and reassure potential investors. While not every witness who testified about how her investment was directly linked to the campaign finance scheme, several of them expressly noted these connections.

There is thus no question that the evidence was relevant. Mere relevance, however, is not sufficient to guarantee admissibility of evidence of a defendant's other bad acts – or indeed, of any evidence. Even relevant evidence may be excluded, subject to the discretion of the district court, when its probative value is "substantially outweighed by a danger of . . . unfair prejudice," Fed. R. Evid. 403, which is particularly important in connection with evidence of other crimes. Hsu argues that the volume of Ponzi-scheme evidence admitted at his trial was excessive, resulting in disproportionate prejudice.

The district court's handling of the evidence here, however, cannot be held to have been plainly erroneous. "District courts have broad discretion to balance probative value against possible prejudice, and we will not disturb that balancing unless there is a clear showing of abuse of discretion." United States v. Bermudez, 529 F.3d 158, 161 (2d Cir. 2008) (internal citation and quotation marks omitted). It is especially difficult to fault a district court's balancing when the party appealing the admission of the evidence never sought a ruling that would have made the court's balancing process explicit.

Here, the record shows that the district judge was alert to the risks of unfair prejudice. Before the trial began, the government noted its intent to call some witnesses who would describe Hsu's Ponzi scheme. Unprompted by any objection from the defendant, the judge raised "a question as to how many witnesses" the government could legitimately use "for the purposes of 404(b) evidence," and stated his "inclination at the moment [] to say that . . . more than a couple, a handful, [] may be excessive." Defense counsel then noted that he agreed that "some testimony" relating to the Ponzi scheme was relevant "as it relates to why contributions were made," but that he "would object [to Ponzi-scheme testimony] if it has no bearing on the issue of the political contributions." The district court then again emphasized that while the testimony was indeed relevant, its extent was in question. The judge later returned to this issue, emphasizing again that while there was not "much dispute or difficulty" about the relevance of the evidence, "highly emotional victim testimony could be prejudicial."

The district court was thus attuned to the need to make a proper balance. That sensitivity continued during the trial. When the government called the witnesses in question, defense counsel – who had earlier stated an intent to object when such evidence went beyond the agreed bounds – lodged no objection, evidently concluding that the government had not exceeded the point when prejudice began to outweigh relevance. It was the district judge who sua sponte raised a question as to whether the government's evidence was sufficiently linked to the campaign finance scheme, or whether it was

15

beginning to be "cumulative," effectively halting the presentation save for one final witness, Chorvat, whose testimony did directly connect the two schemes.

Under the circumstances, we cannot say that the district court's decision regarding where to draw the line was an abuse of discretion, let alone plain error. The evidence was clearly relevant, as Hsu acknowledges; the sole question was where to draw the line so that its acknowledged relevance would not be swamped by the prejudice that could result if the trial's focus shifted from the campaign finance counts which were on trial, to the Ponzi counts, which were not. We cannot say that the particular place at which the judge chose to draw that line, unaided by any objection or argument from the defense, was plainly erroneous.

Admission of testimony regarding the California conviction and arrest was also appropriate. The reaction to Hsu's arrest on the California warrant was the precipitating factor in the collapse of his Ponzi scheme and the discovery of his frauds; testimony about the arrest, to which Hsu had stipulated, therefore bore a relevant connection to the violations of campaign finance laws that were the basis for his trial.

For these reasons, Hsu's evidentiary challenges are unavailing.

## III.  Sentence: Procedural Objections

Hsu asserts three challenges to his sentence. First, he argues that the district court inappropriately characterized "interest" as part of the intended loss associated with Hsu's scheme, in contravention of United States Sentencing Guidelines Section 2B1.1. Second,

he argues that the district court failed to consider the Section 3553(a) factors that pointed in Hsu's favor. And third, he argues that the district court's failure to grant him a new attorney for the purposes of sentencing violated his Sixth Amendment rights.

Our review of district court sentencing decisions encompasses review of both procedural and substantive errors. See United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). A district court "commits procedural error where it . . . makes a mistake in its Guidelines calculation, . . . does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact." Id. at 190 (internal citations omitted); see also Gall v. United States, 552 U.S. 38, 51 (2007). "[I]n determining the appropriate standard of review for a district court's application of the Guidelines to the specific facts of a case, [this Court] follow[s] an either/or approach, adopting a de novo standard of review when the district court's application determination was primarily legal in nature, and adopting a clear error approach when the determination was primarily factual." United States v. Gotti, 459 F.3d 296, 349 (2d Cir. 2006) (internal quotation marks omitted). We review substantive challenges to a sentence under a "deferential abuse-of-discretion standard." Cavera, 550 F.3d at 189.

A. Calculating Loss in Ponzi Schemes

The Sentencing Guidelines define loss stemming from criminal fraud as "the greater of actual loss or intended loss," the latter including "the pecuniary harm that was intended to result from the offense" whether or not the "intended pecuniary harm . . .

17

would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B.1.1, Application Note 3(A)(ii). Moreover, such losses, whether actual or intended, "shall not include . . . [i]interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." U.S.S.G. § 2B.1.1, Application Note 3(D)(i). Hsu argues that the district court's calculation of loss included such interest or agreed-upon returns in violation of the Guidelines' instruction. The question, therefore, is whether a federal sentencing court can include as part of its "intended loss" determination those earnings that victims reinvested in a Ponzi scheme, even though those "earnings" were invented as part of the scheme itself.[3]

We agree with the district court that it can. The guidelines provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested, not by the principal amount plus the promised interest or return that was never received. The situation is different, however, in a case in which an investor is told not simply that his investment *will* grow, but that it *has grown*, and that the total of his original investment and the

---

[3] The calculation of damages associated with Ponzi schemes presents legal problems in other contexts as well. Attempts to compensate victims, for example, may involve controversial efforts to disgorge gains from some investors in order to compensate losses of others. See Madoff, 654 F.3d at 235. In the criminal sentencing context, where the purpose is punishment, we look at the *greater* of either actual losses suffered to the victims or the losses the defendant intended to accomplish by virtue of the scheme. The analysis is thus appropriately distinct from that implicated in calculating an award of victim restitution.

18

accrued interest or other gain is now available to be withdrawn or reinvested in the scheme, depending on the investor's preference. When an investor in a Ponzi scheme faces the choice either to withdraw or to reinvest, the choice to reinvest – an act frequently necessary to maintain the scheme itself – transforms promised interest into realized gain that can be used in the computation of loss for the purposes of federal sentencing. In such a case, only the most recent promised or reported interest gains are excluded from sentencing consideration as per the Guidelines' exclusion of interest or rates of return from the loss calculation.[4]

The rule proposed by Hsu, which would calculate losses only by looking at the money actually invested by victims, would fail to take into account the natural and indeed desired reactions that investors will have to Ponzi schemes as they unfold. Victims' behavior necessarily changes in the face of the fraudulent reports of the success of their investments. That the purported proceeds from such "success" are maintained in accounts under the defendant's control, and not withdrawn by the investors, is essential to the very purpose of the Ponzi scheme. Nevertheless, when the victims are given the option of withdrawing the proceeds, and when the perpetrator induces them not to do so, but instead to reinvest the money and again put it at risk, the victims have suffered further loss. Reinvested historical gains – which, as the district court noted, were "part of a

---

[4] In reaching this conclusion, we follow the Eighth Circuit's treatment of similar schemes. See United States v. Alfonso, 479 F.3d 570 (8th Cir. 2007); United States v. Hartstein, 500 F.3d 790, 800 (8th Cir. 2007).

19

malicious effort to maintain [investors'] confidence and lure other victims" – have become part of the investors' expected gains and wealth, altering their decision-making, encouraging trust in the scheme, and thus inviting the infusions of capital that any Ponzi scheme needs to survive.

In some instances, the task of defining "reinvestment" will be a difficult factual inquiry that district courts will have to pursue with care. While the basic architecture of a Ponzi scheme is consistent from one scheme to the next, see, e.g., Eberhard, 530 F.3d at 132 n.7, the details in each case will vary. What constitutes interest precluded from consideration during sentencing in one context may be the very loss intended in another. The district court must necessarily consider the structure of the scheme to determine the extent to which promised returns were projected interest payments or realized gains.

The task in Hsu's case, however, is straightforward. Hsu's victims frequently returned post-dated checks to him for reinvestment, thereby relinquishing the opportunity to cash those checks and withdraw from the scheme. When this occurred, the reinvested checks – including the previously promised returns – became part of their principal investment, and therefore constitute the very losses that Hsu intended to inflict upon his victims. The fact that such money may never have "existed," or that the scheme may have collapsed sooner if all investors had attempted to withdraw their purported gains at once, does not affect the loss calculation. On the facts of this case, the investors were given a clear opportunity to withdraw the total amount of their principal and accrued

20

interest, and were induced not to do so by fraudulent promises of continued gain. The reinvestments were thus appropriately counted as loss. Hsu's argument that the "gains" did not exist, and that there was no money to pay the investors, reduces to the claim that the victims' losses do not count because he was unable to pay them back.

We do not say that the method chosen by the district court was the only way to measure loss in a Ponzi scheme case. Since, under the guidelines, the district court is required only to make "a reasonable estimate of loss," see, e.g., United States v. Rigas, 583 F.3d 108, 120 (2d Cir. 2009), other methodologies might have been appropriate in this case, and might even be preferable in other cases depending on the particular facts of the case. We hold only that Application Note 3(D)(i)'s exclusion of "interest" from loss calculations does not apply here, and that the district court's calculation is otherwise reasonable and appropriately measures the scope of the harm done to victims. We therefore have no reason to disturb it.

B. Mitigating Factors

Hsu next argues that, in determining Hsu's sentence, the court failed to consider or improperly weighed mitigating factors and that the district court's general references to white-collar defendants meant that the court had failed to make an "individualized assessment."

Hsu mischaracterizes the district court's sentencing decision. The district court did not fail to weigh the mitigating factors presented in Hsu's sentencing arguments; it simply

weighed the factors and came to conclusions that Hsu did not like. Moreover, the district court's effort to provide context for Hsu's arguments was not undertaken to mock him, as Hsu argues. Instead, the district court's findings directly respond to Hsu's claims that his crime, behavior, rehabilitation, and mental culpability are unique. Such determinations plainly survive the "deferential abuse-of-discretion standard" of review to which we subject the weighing of § 3553 factors. See United States v. Johnson, 567 F.3d 40, 51 (2d Cir. 2009), citing Gall, 552 U.S. at 41.

C. Sixth Amendment

Finally, Hsu contends that the district court's refusal to grant his repeated requests that the court appoint new counsel for sentencing to replace his retained trial counsel violated his Sixth Amendment rights to effective assistance of counsel. We review a district court's denial of a motion to substitute counsel for abuse of discretion. United States v. Simeonov, 252 F.3d 238, 241 (2d Cir. 2001). In undertaking this review, we consider (1) whether the defendant's motion for new counsel was timely; (2) whether the district court adequately inquired into the matter; (3) whether the conflict between defendant and attorney "was so great that it resulted in a total lack of communication preventing an adequate defense;" and (4) "whether the defendant substantially and unjustifiably contributed to the breakdown in communication." United States v. John Doe No. 1, 272 F.3d 116, 122-23 (2d Cir. 2001) (internal quotations and citations omitted).

22

It is of no moment that the district court rejected Hsu's requests without providing an explanation or holding a hearing, as these procedures are only necessary when the defendant lodges a "seemingly substantial complaint about counsel." Cf. United States v. Calabro, 467 F.2d 973, 986 (2d Cir. 1972). When the defendant's complaints about counsel are fully made to the court, "the court may rule without more." Simeonov, 252 F.3d at 241. Hsu registered no such substantial complaint. Rather than a "total lack of communication," John Doe No. 1, 272 F.3d at 122, Hsu alleged only dissatisfaction with his attorney's trial performance. But the Sixth Amendment does not guarantee flawless defense strategy; it provides only for "reasonably competent representation." Hernandez v. United States, 202 F.3d 486, 488 (2d Cir. 2000), citing Strickland v. Washington, 466 U.S. 668, 687-91 (1984). While we express no ultimate judgment on the quality of Hsu's counsel's trial performance, we note that nothing in Hsu's letters alerted the district court to material defects in counsel's representation. We therefore find no abuse of the district court's discretion in rejecting Hsu's motion.

Moreover, Hsu points to no prejudice resulting from the district court's refusal to replace Hsu's retained lawyer. Hsu was fully represented at all stages of the sentencing proceeding, during which defense counsel zealously represented Hsu, submitting a request for a psychological evaluation prior to sentencing to help develop mitigating evidence, objecting to the guidelines calculations of the Pre-Sentence Report, responding in writing to the government's sentencing submission, and presenting legal arguments and

23

mitigating information both orally and in writing.  Hsu points to no defect in counsel's performance at sentencing, and suggests no way in which he could have been better represented in the sentencing process.  His objection therefore provides us with no reason to disturb the sentence.

## CONCLUSION

We have considered the defendant's remaining arguments on appeal and find them to be without merit.  Accordingly, for the foregoing reasons, the judgment of the district court is AFFIRMED.