United States v. Hopkins

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 6th day of June, two thousand twenty-two.

PRESENT:
> **BARRINGTON D. PARKER,**
> **MICHAEL H. PARK,**
> **EUNICE C. LEE,**
> *Circuit Judges.*

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.                                                                              20-3825

ARIUS HOPKINS, AKA Scrappy, AKA Scrap,

*Defendant-Appellant.*[*]

_____

| | |
|---|---|
| FOR DEFENDANT-APPELLANT: | GLENN A. GARBER, Glenn A. Garber, P.C., New York, NY. |
| FOR APPELLEE: | MARGARET GRAHAM (David Abramowicz, *on the brief*), Assistant United States Attorney, *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY. |

_____

[*] The Clerk of Court is respectfully directed to amend the caption accordingly.

Appeal from a judgment of the United States District Court for the Southern District of New York (Kaplan, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Arius Hopkins was convicted after a jury trial of one count of murder through the use of a firearm, 18 U.S.C. § 924(j), and one count of murder in furtherance of a narcotics conspiracy, 21 U.S.C. § 848(e)(1)(A). The government charged Hopkins and codefendant Alexander Melendez with murdering a rival drug dealer, Shaquille Malcolm, on January 2, 2014. According to the government, Theryn Jones, the leader of the MacBallas gang, ordered Malcolm to be killed after Malcolm began undercutting Jones's drug prices. On the day of the murder, Melendez and Hopkins followed Malcolm as he exited an IHOP restaurant. When Malcolm arrived at his destination and headed upstairs, a third individual, Joel Riera, was told to call 911 with a phony emergency in an effort to keep the police at bay. Jones, meanwhile, said he would call a drug customer who would ask Malcolm to meet in the lobby for a sale, drawing Malcolm into the open. When Malcolm went downstairs as planned, Melendez and Hopkins fatally shot Malcolm, firing more than thirteen rounds from .22 and .40 caliber firearms, respectively.

The government jointly tried Hopkins and Jones. For the charges against Hopkins, the government principally relied on: (1) testimony from Melendez, who had previously pled guilty under a cooperation agreement; (2) testimony from fellow gang member Jamal Costello that he heard about the murder from Jones and elicited a laugh from Hopkins when Costello told him not to "think somebody scared of you because you killed the guy," App'x at 850; (3) testimony from Riera, who received immunity, that he was told to make the phony 911 call to the police; (4) forensic evidence confirming that Malcolm was shot with .22 and .40 caliber firearms;

2

(5) testimony from bystander Keisha Wallace, who observed two men fleeing from the scene of the murder; and (6) a rap music video in which Hopkins refers to a murder with a .40 caliber gun. Hopkins testified as part of his defense. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

First, Hopkins argues that the district court impermissibly admitted evidence of another, earlier incident in 2012 in which Melendez and Hopkins went to attack members of a rival gang. At trial, Melendez testified that Hopkins was armed but tossed the gun away upon seeing police. The parties also stipulated that an NYPD sergeant, if called, would have testified that he saw Hopkins with a firearm in the vicinity and arrested him. On cross-examination of Hopkins, the government referred to his testimony before a state grand jury—which ultimately declined to indict Hopkins—specifically by asking (a) whether Hopkins told the grand jury that the gun police found in the bushes was not his, and (b) whether this was a lie. Hopkins admitted the former but denied the latter.

Hopkins asserts that this evidence and questioning ran afoul of Federal Rule of Evidence 404(b)(1), which prohibits the introduction of "any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Such evidence is admissible if offered "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "This Circuit follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under [Fed. R. Evid. 403] nor irrelevant under [Fed. R. Evid. 402]." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011). Also admissible is "direct evidence of the crime charged," *i.e.*, evidence that "arose out of the same transaction or series of

3

transactions as the charged offense, . . . is inextricably intertwined with the evidence regarding the charged offense, or . . . is necessary to complete the story of the crime on trial." *United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012) (second quotation quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)). We review evidentiary rulings for abuse of discretion, *United States v. Quinones*, 511 F.3d 289, 307–08 (2d Cir. 2007), and disturb the conviction only if the defendant demonstrates that the error "affect[s] substantial rights," Fed. R. Crim. P. 52(a).

We need not address the admissibility of this evidence because even assuming the admission was in error, any such error would have been harmless. For one thing, the evidence "was unimportant in relation to everything else the jury considered on the issue in question," *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010) (citation omitted), consisting only of a stipulation and four transcript pages of Melendez's hundreds of pages of testimony. And for another, any possible prejudice from the testimony was mitigated by the district court's limiting instructions not to consider the evidence as proof of Hopkins's criminal propensity. *See United States v. Dupree*, 706 F.3d 131, 139 (2d Cir. 2013).[1]

Second, Hopkins contends that the district court's jury instruction undermined the presumption of innocence and burdened his right to testify. Review of jury instructions is de novo, and we ask whether "the charge, taken as a whole, [is] prejudicial." *United States v. Caban*, 173 F.3d 89, 94 (2d Cir. 1999).

The court instructed the jury as follows:

> Now, in evaluating credibility, you should take into account any evidence that a witness might benefit in some way from how the case comes out. We call that an interest in the outcome, and an interest in the outcome can create a motive to testify

---

[1] Hopkins also argues that the government's cross-examination of him was improper under Federal Rule of Evidence 608(b). But that rule disallows only the use of "extrinsic evidence" of specific instances of past conduct to attack the witness's character for truthfulness. Merely inquiring into those instances is proper. Fed. R. Evid. 608(b).

4

falsely, and it may sway a witness to testify in a way that advances the witness' own interests. You should bear in mind, though, that it does not automatically follow that an interested witness should be disbelieved. It's for you to decide, based on your own perceptions and common sense, to what extent, if at all, a witness' interest has affected his or her testimony.

App'x at 1505. Then, in a separate portion of the instructions, the court charged the jury about

Hopkins's testimony:

Now, let me talk about the defendants for a minute. Under the Constitution, as I told you on day one, a defendant never is required to testify or present any evidence because it's the government's burden to prove a defendant guilty beyond a reasonable doubt. No defendant ever has to prove that he's innocent. . . .

Arius Hopkins did testify. He was cross-examined like any other witness. You should examine and evaluate his testimony just as you would examine and evaluate the testimony of any witness who has an interest in the outcome of the case.

*Id.* at 1515–16. Citing this Court's case law on interested-witness instructions, Hopkins asserts

that the district court's charge ran afoul of the rules announced in *United States v. Gaines*, 457

F.3d 238 (2d Cir. 2006), and its progeny. *See, e.g.*, *United States v. Brutus*, 505 F.3d 80 (2d Cir.

2007); *United States v. Mehta*, 919 F.3d 175 (2d Cir. 2019); *United States v. Solano*, 966 F.3d 184

(2d Cir. 2020).

The instructions at issue here, however, do not fall within the scope of the holdings of these

cases because the district court merely instructed the jury that "an interest in the outcome *can*

create a motive to testify falsely." App'x at 1505 (emphasis added). We approved a very similar

instruction in *United States v. Gleason*, 616 F.2d 2 (2d Cir. 1979), in which the jury was instructed

that an interest "creates, *at least potentially*, a motive for false testimony." *Id.* at 15 (emphasis

added). To be sure, in *Gaines*, we "direct[ed] district courts in the [C]ircuit not to charge juries

that a testifying defendant's interest in the outcome of the case creates a motive to testify falsely."

457 F.3d at 247. But the *Gaines* panel did not and could not overrule past cases. *See id.* at 250

n.10 (distinguishing *Gleason* because an "instruction that [an interest] 'creates, *at least potentially*,

5

a motive for false testimony' does not assume guilt" (quoting *Gleason*, 616 F.2d at 15 (emphasis by *Gaines* Court)))[2] Thus, the instruction here, like the one in *Gleason*, which merely noted the *potential* creation of a motive to testify falsely, remains permissible.

Third, Hopkins objects to the trial judge's questioning of defense witnesses from the bench. We will disturb a conviction on those grounds only where "the conduct of the trial has been such that the jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the determination of the jury." *United States v. Valenti*, 60 F.3d 941, 946 (2d Cir. 1995) (quoting *United States v. Guglielmini*, 384 F.2d 602, 605 (2d Cir. 1967)). Here, the trial judge's questioning was appropriate. The district court inquired of an eyewitness, Jenna Perry, whether it was dark when she observed two individuals fleeing the crime scene. The trial judge asked about the matter because (a) Perry had already testified that "it was really dark" and she "couldn't make out the jackets" they were wearing, and (b) defense counsel nevertheless asked whether anyone she saw "ha[d] a green coat on." App'x at 1124. The court also asked a ballistics expert, Hal Sherman, about his methodology, following up on the court's initial inclination to exclude Sherman's testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Neither line of inquiry was inappropriate.[3]

Fourth, Hopkins asserts that the district court abused its discretion by admitting a rap music video he had recorded. The video describes facts similar to those of the murder. Hopkins describes

---

[2] In *Brutus*, using this Court's "mini en banc" procedure, we overruled certain previous cases, but on unrelated grounds. *See Brutus*, 505 F.3d at 87 & n.5 (holding that an instruction remained defective despite "omit[ting] additional language specifically cautioning the jury to carefully scrutinize and weigh the defendant's testimony" and overruling *United States v. Tolkow*, 532 F.2d 853 (2d Cir. 1976); and *United States v. Floyd*, 555 F.2d 45 (2d Cir. 1977)).

[3] Hopkins similarly says that the district court improperly cut off his cross-examination of government witnesses. But the court merely barred defense counsel from stating the contents of documents that were not in evidence, after counsel failed to successfully use those documents to refresh witness recollections.

6

others as "frontin[g]," himself as "dumping," and another as "slumpin[g]." App'x at 1567. He further says that there were "no witnesses so it's nobody to rat. The types of artillery you know that we strapped." *Id.* The parties dispute the lyrics that follow, most importantly whether Hopkins says (a) "I come with the 40, I come from the back" or (b) "*Rah* come with the 40, I come from the back." *Id.* (emphasis added). In the government's version, Hopkins portrays himself as carrying the .40 caliber weapon he was charged with using to murder Malcolm; in Hopkins's version, he is referring to a different individual with a .40 caliber weapon.[4] The district court found by a preponderance of the evidence that Hopkins in fact said "I come with the 40" and admitted the video. We find no error in that decision, given the similarity of the events recounted by Hopkins's lyrics and the charged offense.

Finally, Hopkins argues that the district court abused its discretion by declining to hold a hearing or interview jurors about potential bias. *See United States v. Stewart*, 433 F.3d 273, 302–03 (2d Cir. 2006) (review for abuse of discretion). After the trial, Juror #1 told Judge Kaplan that she and other jurors were afraid of retaliation after the guilty verdict. Juror #12 also called to relay that (a) one juror saw Hopkins's mother taking notes during the voir dire and later feared that the notes could include identifying information about the jurors; and (b) Hopkins's mother followed one juror immediately after trial yelling that the jury got it wrong and let out a "blood-curdling scream," leading certain jurors to fear for their safety. Hopkins argues that the district court should have conducted further inquiry to determine whether the jury was improperly influenced. But "probing jurors for potential instances of bias, misconduct or extraneous influences after they have reached a verdict is justified only when reasonable grounds for investigation exist, in other words, where there is clear, strong, substantial and incontrovertible evidence that a specific,

---

[4] Hopkins testified that he included the second "I" to be "artistic." App'x at 1221.

7

nonspeculative impropriety has occurred which could have prejudiced the trial." *Id.* (cleaned up). There was no such incontrovertible evidence here. Indeed, other than the observation of Hopkins's mother taking notes, the comments reflect events that occurred after, not before or during, jury deliberations. We thus conclude that the district court did not abuse its discretion.

We have considered the remainder of Hopkins's arguments and find them to be without merit. For the foregoing reasons, we affirm the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court