PER CURIAM:
This appeal principally raises two issues: (1) whether the misrepresentations underlying these convictions were not material because no reasonable financial professional would have believed them, and (2) whether the sentences imposed on appellants are proeedurally unreasonable. We affirm the District Court’s denial of appellants’ motions for acquittal, but vacate appellants’ sentences and remand for resentencings.[1]
I. BACKGROUND
This appeal arises out of a conspiracy to defraud a non-existent investor of three billion dollars. In the spring of 2006, defendants John Juncal, James Campbell, Rodney Sampson, and Emerson Corsey were arrested and charged with one count of conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341,1343, and 1349. Over the preceding four months, the defendants had attempted to lure a broker, Thomas Re, into procuring financing for an imaginary Siberian oil pipeline. The two sides exchanged information about possible partners, and the best structure for a loan. But in reality each side duped the other— Juncal and his colleagues had no plans to build a pipeline across the Russian tundra, *369 and Re never represented a hedge fund interested in lending billions to the defendants to do so.

A. The Scheme

Re was the CEO of Universal Lending Group (“ULG”), a small brokerage firm based in Garden City, New York. Re acted as a “salesperson and networker” for the company; he solicited companies looking for financing and his associate, Joseph Bianco, then matched projects with a hedge fund or bank to act as lender. Re was also an informant for the FBI: Before he worked at ULG, Re sold vending machine routes to snack-food companies. On occasion, Re sold distributors a fake route — the distributors would arrive at a location and find no machine — and the FBI eventually caught up with him. In the hopes of receiving a lighter sentence, Re agreed to turn over information to the FBI about others participating in the vending machine scam.
Re encountered the defendants seven months after he began working with the FBI. Re received a call from an acquaintance, Charles Frazier, who told him to look out for a financier named Emerson Corsey — Juncal, Campbell, and Sampson’s co-defendant. Corsey called a few days later and explained that he was the Chief Operating Officer of Magnolia International Bank and Trust (“MIBT”), a bank that Corsey described as holding assets of sovereign wealth funds. Corsey said that MIBT wanted to borrow three billion dollars to build a pipeline in Siberia and could offer five billion dollars in U.S. Treasury notes (“T-notes”) as collateral for the loan. Re said he would think about it.
Re told his associates about the proposal and, after a brief Google search, they told him the deal “smelled.” J. App’x at 516. Re then reported the potential fraud to his FBI handler, who instructed Re to record his conversations with Corsey.
Over the next few months, Re recorded the defendants as they baited him with an escalating series of lies: Corsey explained that MIBT was the central bank for scores of Native American governments, including the Yamasee Indian tribe, a nation with trillions of dollars in assets. Corsey then said that the bank currently represented John Juncal, a “counsel extraordinaire” for the Republic of Buryatia who had been appointed “Vice Premier of Record under the Edict of the Ukase” by the Buryatian government, and the official charged with finding backers for the pipeline. When Re expressed skepticism, Corsey sent him an email with copies of “bond indentures.” J. App’x at 1021-22. The indentures bore the seal of the Vice-President of Buryatia, and stated that they were valued at five billion U.S. dollars and secured by T-Notes. The certificates were assigned to “the Great Siberian Pipeline Corporation,” which was “a Republic of Wyoming Corporation.” Id. The email also contained proof that Juncal controlled the T-notes: Corsey included another certificate signed by Juncal that listed CUSIP numbers for the T-notes (as an expert would later testify, CUSIP numbers are alphanumeric code created by the U.S. Treasury to identify individual bonds).
Prompted by his handler to record statements by more of the defendants, Re asked to speak with Sampson, the purported Chief Financial Officer of MIBT. Sampson laid out the math behind the deal: MIBT’s client, John Juncal, would assign the T-notes to Re’s client. The T-notes would yield a minimum of 3.9% interest per year and generate over fourteen billion dollars in profit over the course of five years. When Re asked for additional evidence of the T-notes’ authenticity, Sampson sent Re an email from an AOL account *370 for MIBT, rather than from MIBT’s own domain name. Attached to the email were unformatted files containing copies of the T-notes; Re had to use Word Pad to open those files. Sampson then e-mailed Re a “Letter of Acceptance” that re-explained the financing. The letter stated that, in exchange for a loan of three billion dollars, Re’s client would receive T-notes that would yield a 171% return on investment.
Re next pressed Corsey and Sampson to show him physical evidence of the T-notes’ existence. And at that point, Corsey put Re in touch with James Campbell, an associate of Juncal’s. Campbell explained that Juncal had hidden the bonds in Austria in order to prevent enemies from “basically stealing] these from him and bump[ing] him out of the corporation.” J. App’x at 1109. Re pretended to buy the excuse, but later asked if he could speak with Juncal directly. Juncal agreed, and sought to assuage Re’s fears by comparing his role to the historic secret mission of Christopher Columbus.
During his testimony at trial, Re admitted that much of the talk struck him as ridiculous, and that at some point he stopped believing the deal was real. But because of his relationship with the FBI, he continued working with the quartet of pipeline pipe-dreamers. In March, it came time for the deal to close, and Re arranged to meet Campbell and Sampson in New York to sign documents memorializing their agreement. On the day of the closing, the FBI arrested all four defendants; Campbell and Sampson were arrested in New York, Corsey was arrested in Atlanta, and Juncal was arrested at his home, a motel in Whitefish, Montana.
At trial, the government relied almost exclusively on Re’s testimony. No defendant took the stand, and the defense attorneys focused their defense on attacking Re’s testimony. After a short deliberation, the jury returned a verdict of guilty for all four defendants. The appellants’ motions for judgment of acquittal were denied and the cases proceeded to sentencing.

B. The Sentences

In each case, but for the statutory maximum term of imprisonment, the appellants’ Sentencing Guidelines recommended range would have been a life sentence, because the offense level was driven off the Guidelines’ Sentencing Table by an intended loss amount of three billion dollars. Though each appellant argued that the intended loss grossly overestimated the seriousness of the offense, the District Court disagreed. In March of 2010, the District Court sentenced all four defendants to twenty years’ incarceration, the statutory maximum and the Guidelines recommended sentence.
1. Campbell’s Sentencing
The District Court gave a very brief explanation of the reasons for Campbell’s sentence, and largely adopted the logic and recommendations in his Pre-Sentence Investigation Report (“PSR”). Under the Guidelines applicable in 2010, the PSR calculated Campbell’s total offense level to be 47. Under U.S.S.G. § 2B1.1, his base offense level was 7. Thirty points were added because Campbell had intended to defraud an investor of over $400 million. The PSR then added points for four additional enhancements: Campbell received four points because he oversaw five or more co-conspirators, U.S.S.G. § 3B1.1; two levels because he offered fake CUSIPs as an “authentication feature,” U.S.S.G. § 2Bl.l(b)(10)(A)(ii); two levels because Campbell misrepresented himself as a representative of a government or agency, U.S.S.G. § 2Bl.l(b)(8)(A); and two levels *371 because the scheme involved sophisticated means, U.S.S.G. § 2Bl.l(b)(9)(C).
At the sentencing hearing, the government withdrew its request for a role enhancement pursuant to U.S.S.G. § 3B1.1. The District Court asked if that change affected the guideline range:
COURT: And where does it put the guidelines recommendation?
MR. MISKIEWICZ: We’re not privy to the probation officer’s recommendations to the Court. I believe that that is still, at least sent to your Honor. We’re never given a copy.
COURT: Well, my question really is: the original guidelines calculation put it in the 240 month range. Correct?
THE PROBATION OFFICER: That would be the maximum, the statutory maxim.
J. App’x at 1373-74. The District Court then inquired why the Guidelines calculation was so far above the statutory maximum. The prosecutor answered:
MR. MISKIEWICZ: Our position, your Honor, and I think counsel has agreed with this; is a level 43, that is 47 minus 4, it is still life. If he were one point below that he would still be at a 360 to life sentence. So he is in many ways well over the statutory maximum. And we, the government, has in our letter asked for the 20 years statutory maximum here.
THE COURT: And that is what I am inclined to give him.
J. App’x at 1375. The defense then presented its case against enhancements and for downward departures. The District Court rejected each one, explaining its general approach by referencing other recent financial fraud cases:
I don’t know how you can say in this economic age, considering all of the people who have been scammed and defrauded — people of, one would say superior knowledge in finances — I don’t know how we can say that hypothetically had Thomas [Re] not existed and not been available, and not been the contact, this scheme would not have been uncovered.
J. App’x at 1388-89. The District Court then explained the reason for imposing a 20-year sentence:
[T]he Probation Department’s extensive report of your client’s history, and the factors in 3553, and the fact that to date he still shows really no remorse for this crime — still blaming others, and depicting himself as a messenger — I believe this sentence will send a message of deterrence to the defendant, as well as to others.
J. App’x at 1393.
2. Sampson’s Sentencing
Sampson’s PSR contained an identical offense level score. His attorney objected to all five enhancements, but the District Court only accepted Sampson’s arguments on the role enhancement (the government again withdrew its request for the enhancement). As with Campbell, the Court also dismissed the need to recalculate the Guidelines range, explaining that “the maximum is 20 years so it really has no effect.”
Sampson was then asked if he wished to make a statement. Sampson said yes, and launched into an impassioned account of the trials of the Yamasee tribe. He stated that the tribe had waged a centuries-long battle against Western encroachment, only signing a treaty with Georgia in 2003. He referred to the people of Buryatia as a “sovereign aboriginal indigenous nation.” He then explained the motive of the fraud scheme as “doing something to help the people of Buryatia and the people of the Yamasee nation in order to help as far as *372 education, health, welfare, et cetera, to do for ourselves.”
The District Court then sentenced Sampson. Unlike Campbell, Sampson had no prior convictions, but he had been charged with two additional counts of fraud perpetrated while out on bail — he attempted to secure $100 million for a fake oil field, and actually secured $35,000 from another investor through a “lifecycle fraud.” But the Court did not mention these distinctions, nor any other details of Sampson’s case. Instead, the Court made one curt reference to deterrence:
COURT: Anything else you wish to say? These are items counsel can raise on appeal.
MS. GAFFEY: Yes.
COURT: That being said, Mr. Sampson, I am going to sentence you at this time to 240 months in prison, three years supervised release with the following special conditions.... I believe this sentence, which is the maximum permissible under the law, will establish both respect for the law and deterrence to you and perhaps hopefully to others for efforts to engage in fraud.
J. App’x at 1412-13.
3. Juncal’s Sentencing
The District Court again adopted the PSR’s calculations, including the role enhancement, despite the fact that the government was no longer seeking it. The District Court also found that Juncal had a criminal history category of II. Juncal’s only prior convictions were imposed over fifteen years before he tried to sell Re on the Siberian Pipeline, and thus were not countable.[2] See U.S.S.G. § 4A1.2e. In his interview with probation, however, Juncal indicated that he had dreamed of building the Siberian pipeline project since the days of “Reagan.” The District Court credited this statement, and found that he had commenced planning the Siberian fraud scheme decades before he was caught, and determined his prior convictions were countable. The District Court then calculated the Guidelines in a cursory way:
COURT: Well, I believe probation is right. They feel that your objections were not substantiated, and that the present guidelines range stands.
MR. WALLENSTEIN: I take it then, that the court has found that the guideline range noted by probation in the original presentence report is the guideline range that the court finds.
COURT: It is.
J. App’x at 1433.
Juncal chose to speak on his own behalf. He explained that he suffered from a crippling bone marrow disease, and he only had a few years to live. “[Tjhere is no consequence to whether I die in jail or die outside,” he lamented. J. App’x at 1438. He then went on to cite his extensive diplomatic service, most of it invented. As with his co-defendants, the District Court imposed the statutory maximum sentence:
COURT: As recommended by the probation department, 20 years of custody, plus three years of supervised release.
J. App’x at 1444. The Court made no mention of its consideration of any of the factors set forth in 18 U.S.C. § 3553(a) other than the Sentencing Guidelines and the need for deterrence.
II. DISCUSSION
Appellants challenge both their convictions and the sentences imposed as a result of those convictions.

*373
A. Appellants’ Motions for Acquittal: Material Misrepresentations

We first turn to appellants’ contention that there was insufficient evidence for a reasonable jury to conclude that any misrepresentations they made were material. A defendant challenging the sufficiency of the evidence bears a “heavy burden.” United States v. Gaskin, 364 F.3d 438, 459 (2d Cir.2004). We review the evidence “in the light most favorable to the government, crediting every inference that could have been drawn in the government’s favor.” United States v. Chavez, 549 F.3d 119, 124 (2d Cir.2008). A conviction must be affirmed if “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in the original).
Fraud requires more than deceit. A person can dissemble about many things, but a lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person’s evaluation of a proposal. “In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed.” Neder v. United States, 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (internal quotation marks and brackets omitted). The appellants argue that this test requires a jury to conduct a subjective inquiry. According to the appellants, Neder requires a jury to assess whether a person with characteristics similar to the targeted victim would have been convinced by the defendants’ false statement. And in this case, appellants posit, no reasonable investment professional would have bought the conspirators’ absurd story; any broker would have laughed in disbelief the moment he opened an email from a wealthy bank sent from an AOL email address, found doctored copies of T-notes, and learned that a long-disbanded Native American tribe owned them.[3] Thus, the argument goes, because no potential victim of this particular fraud would have ever fallen for it, the appellants’ lies were not “capable of influencing the decision of [any] decisionmaking body.”
We have not directly addressed whether Neder requires something more than an objective assessment of whether a defendant’s lies were believable. In a related context, we have held that a defendant is liable for an objectively absurd lie if a subjectively foolish victim believes it. Otherwise “the legality of a defendant’s conduct would depend on his fortuitous choice of a gullible victim.” United States v. Thomas, 377 F.3d 232, 243 (2d Cir.2004) (citations omitted). Appellants aim to flip this rule so that a defendant is not liable for an objectively absurd lie if a subjectively sophisticated victim would never believe it. But no court has ever extended “the gullible victim” doctrine in this way, and we need not reach the question whether we should.
*374 Taking the facts in the light most favorable to the government, we conclude that a reasonable jury could find that appellants’ misrepresentations were material, regardless of whether Re, or others like him, should have heeded them or not. Appellants engaged in an illegal conspiracy to defraud potential investors the moment that Corsey offered Re billions of dollars in fake T-notes as collateral for a large loan. Re testified that he was convinced enough by Corsey’s statements to vet the deal with his colleagues. Corsey’s misrepresentation, then, actually influenced Re to investigate the proposal. And Re testified that his colleagues quickly performed Google searches to see if Re should explore the deal. Everything that followed that conversation and that initial internet search — the analogy to Christopher Columbus, the promised 171% rate of return, the crudely doctored certificates of authenticity — made Corsey’s lie on behalf of the conspirators seem ridiculous in retrospect. But the initial misrepresentation remains material; a reasonable jury could find that a promise of five billion dollars in collateral could persuade Re, his colleagues, and reasonable lenders to make a three-billion-dollar loan.[4]

B. Sentencing: Review for Reasonableness

We review a district court’s sentence for “reasonableness, which is ‘akin to review for abuse of discretion, under which we consider whether the sentencing judge exceeded the bounds of allowable discretion, committed an error of law in the course of exercising discretion, or made a clearly erroneous finding of fact.’ ” United States v. Leslie, 658 F.3d 140, 142 (2d Cir.2011) (per curiam) (quoting United States v. Williams, 475 F.3d 468, 474 (2d Cir.2007)). This broad discretion is due to district courts because they are a better positioned institutionally to determine the appropriate sentence in a particular case. United States v. Fernandez, 443 F.3d 19, 27 (2d Cir.2006).
We begin our analysis with a review of the sentences’ procedural reasonableness. A district court will normally “begin all sentencing proceedings by correctly calculating the applicable Guidelines range,” Gall v. United States, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), and will then consider the factors listed in 18 U.S.C. § 3553(a) before imposing a final sentence. United States v. Preacely, 628 F.3d 72, 79 (2d Cir.2010). A judge need not utter “robotic incantations” repeating each factor that motivates a sentence. United States v. Crosby, 397 F.3d 103, 113-14 (2d Cir.2005) (abrogated on other grounds). Nonetheless, the judge must explain enough about the sentence for a reviewing court both to understand it and to assure itself that the judge considered the principles enunciated in federal statutes and the Guidelines. Rita v. United States, 551 U.S. 338, 357, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). Here, appellants offer two critiques of the way the District Court imposed their sentences. First, they argue that the District Court either miscalculated the Guidelines range or failed to calculate the range entirely. Second, defendants claim that the District Court did not appropriately weigh the factors enunciated in 18 U.S.C. § 3553(a).
The District Court technically may have cut a corner when it glossed over the *375 calculation of appellants’ precise adjusted offense level, but that shortcut had no effect on appellants’ ultimate Guidelines range. In each case, the amount of intended loss catapulted appellants’ offense levels to 37, a number yielding a suggested period of incarceration above the statutory maximum of 20 years. Once the offense level crossed that threshold, any additional enhancement would have had at most an academic impact on the Guidelines range; the recommended term of incarceration would have always reverted back to twenty years. U.S.S.G. § 5G1.1 (a) (“[wjhere the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.”). Rather than resolve technical arguments about each enhancement, the District Court chose a more pragmatic approach — it calculated the Guidelines in sufficient detail to know that the resulting sentencing range would inevitably equal 20 years regardless whether certain additional enhancements applied.
The District Court was free to prioritize efficiency over an exercise in futility. In Rita v. United States, the Supreme Court instructed district courts to begin each sentencing evaluation with a proper calculation of the Guidelines range. 551 U.S. at 351, 127 S.Ct. 2456. We have interpreted that command to hold that a district court “commits procedural error where it fails to calculate the Guidelines range.” United States v. Cavera, 550 F.3d 180, 190 (2d Cir.2008). Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence. For this reason, we have vacated sentences where a district court skipped a step in the Guidelines calculation because it had already decided to impose a non-Guidelines sentence. See United States v. Oliveras, 359 Fed.Appx. 257, 259 (2d Cir.2010) (vacating sentence where district court never addressed career offender enhancement because it intended to reduce criminal history score that overstated severity of defendants’ pri- or convictions). But we have never held that a court commits procedural error where it bypasses a minefield of tricky determinations and still arrives at the correct Guidelines recommended sentencing range. To do so would be the equivalent of docking a test grade even though a student found a quicker route to the right answer. Cf. Cruz v. Miller, 255 F.3d 77, 86 (2d Cir.2001) (“[W]e are determining the reasonableness of the state courts’ ‘decision’ ... not grading their papers.”). Here, the District Court fulfilled its duty to calculate the Sentencing Guidelines sufficiently fully to determine the correct recommended period of incarceration, 20 years, and its particular method of arriving at that determination under the circumstances of these sentencings did not constitute reversible error.[5]
But the District Court still had an obligation to weigh the factors listed in section 3553(a), and we are not certain that occurred. See Fernandez, 443 F.3d at 28 (declining to hold within-Guidelines sentence presumptively reasonable). Here, appellants’ maximum sentences had an air of inevitability. Because appellants’ Guidelines ranges prior to application of the section 5G1.1 limit soared past the statutory maximum, the District Court seemed to assume that imposing a statutory maximum sentence reflected a per se reasonable sentence. At Campbell’s hearing, the District Court chastened the defense attorney by noting that “even with *376 out [an] enhancement there would still be a maximum of a life sentence. Correct?” J. App’x at 1373. After a confusing colloquy with the probation officer and the prosecutor, the Court then correctly noted that as a technical matter the Guidelines range would revert back to the statutory maximum. That unavailable life sentence, however, hung in the air and framed the Court’s perfunctory analysis of the section 3553(a) factors. A similar dynamic occurred during Sampson and Juneal’s sentencing hearings. See Sampson Hearing (noting that enhancement “really has no effect” because court was forced to ratchet Guidelines range down to a twenty-year sentence); Juncal Hearing (skipping independent Guidelines analysis and imposing statutory maximum). The record, then, is muddied by the District Court’s elision of two questions — how to understand the reversions of the Guidelines range to the statutory maximum of 240 months, and whether a statutory maximum sentence was sufficient but not greater than necessary to serve the purposes of sentencing enunciated in section 3553(a).
If in fact the District Court treated 240 months as the only reasonable sentence (because the statutory maximum prohibited imposition of a true Guidelines sentence closer to life), then it committed procedural error. Even when section 5Gl.l(a) ratchets down a range, the lower Guidelines range is still the recommendation, and should be treated as a starting point in a deeper analysis, not a revision that obviates the need to consider further what sentence to impose. See Cavera, 550 F.3d at 189-90 (stating that our review for procedural reasonableness “requires that we be confident that the sentence resulted from the district court’s considered judgment as to what was necessary to address the various, often conflicting, purposes of sentencing”). If, however, the District Court understood the effect of section 5Gl.l(a), and still chose to impose the maximum sentence after considering the commands of section 3553(a), then the sentence may have been procedurally sound. But the record here is ambiguous, and we have often vacated and remanded sentences where a “the judge’s sentencing remarks create ambiguity as to whether the judge correctly understood an available option.” United States v. Thorpe, 191 F.3d 339, 342 (2d Cir.1999) (citations omitted); see also United States v. Jones, 531 F.3d 163, 181 (2d Cir.2008) (vacating sentence where “district court’s explanation for its decision to impose a Guidelines sentence is ambiguous as to its understanding of an area of law”); United States v. Toohey, 448 F.3d 542, 545 (2d Cir.2006) (counseling that remand is appropriate where record reflects “misunderstanding by a district court as to the statutory requirements and the sentencing range ... or misperception about their relevance”). In a case clouded by the possibility of error, we feel it appropriate to give the District Court an opportunity to clarify its thinking.
Remand is also appropriate for two additional reasons. First, the sentencing court gave only a passing mention to any of the section 3553(a) factors. In each case, the District Court justified a maximum sentence by relying almost exclusively on one word — “deterrence.” Certainly, a judge need not chronicle the deliberative journey taken to arrive at a sentence, but she must still create enough of a record so that an appellate court can “be confident that the sentence resulted from the district court’s considered judgment as to what was necessary to address the various, often conflicting, purposes of sentencing.” Cavera, 550 F.3d at 189-90. In other words, just as we do not insist upon “robotic incantations,” we require more than a few magic words.
*377 This is especially true in light of the appellants’ arguments for lighter sentences. “[W]here the appellant or prosecutor presents nonfrivolous reasons for imposing a different sentence ... the judge will normally go further and explain why he has rejected those arguments.” Rita, 551 U.S. at 357, 127 S.Ct. 2456 (2007). Here, appellants’ lawyers highlighted significant issues with the intended loss calculation both in their briefs and at sentencing. Given the low risk that any actual loss would result — what hedge fund would fall prey to a purported coalition of Buryatian nationals and Yamasee tribesmen using AOL email accounts to offer five billion dollars in collateral for a loan to build a pipeline across Siberia? — counsel argued that a 30-point mega-enhancement vastly overstated both the seriousness of the offense, and the danger of appellants to their community. The Guidelines acknowledge that potentiality; application note 19(C) to U.S.S.G. § 2B1.1 indicates that a downward departure may be warranted where the offense level resulting from a loss calculation overstates the seriousness of an offense. But the sentencing court never resolved appellants’ significant arguments. At Sampson’s hearing the District Court did draw a comparison between other financial crimes and this case, but it never resolved the question raised by the appellants — whether treating intended loss like actual loss under all the circumstances of this case leads to a sentence consistent with the dictates of section 3553(a).
In addition, the District Court appears to have assumed that it could incorporate by reference comments made during one appellant’s sentencing hearing when conducting another. When Sampson’s attorney attempted to argue that the loss was overstated, the District Court referenced a rejoinder made at Campbell’s hearing. Even in multi-defendant cases, the court must sentence each defendant separately. Though it should of course avoid disparities among defendants of equal culpability, the court must come to an independent determination of the appropriate punishment for each defendant, and must create a record of that individualized determination. See 18 U.S.C. § 3553(c) (obligating sentencing court to state reasons for imposing a punishment in open court). That did not occur here, and we counsel the District Court to make individualized records on remand.
For these reasons, the appellants’ sentences were procedurally unsound and appellants are entitled to resentencing. Although we find procedural error, we decline appellants’ request to consider whether their sentences were substantively unreasonable.
II. CONCLUSION
We affirm the appellants’ convictions, but vacate their sentences and remand for resentencings consistent with this decision.

. The appeal filed by co-defendant Emerson Corsey was severed from these consolidated appeals and heard by a different panel. Corsey's conviction was affirmed by summary order, but his sentence was vacated for procedural error and remanded for resentencing. United States v. Corsey, 512 Fed.Appx. 6 (2d Cir.2013).

. Indeed, Juncal's most recent brush with the law was in 1997, a case that the government declined to prosecute after Juncal was found incompetent to stand trial.

. Defendants also suggest that every bank has a duty to engage in due diligence, so that no bank could ever be induced to loan money without first checking out a potential client. In this case, any bank that researched the appellants’ backgrounds would have backed out of a deal. Appellants, however, do not point to any decision that conditions a finding of fraud on some affirmative step that a victim might take. The question is not whether victims might smell a rotten deal before they hand over money. See United States v. Gotti, 459 F.3d 296, 331 (2d Cir.2006) (“[I]n wire fraud cases, it is the scheme itself, rather than its success, that is the required element for conviction.”). Instead, a misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do.

. In fact, appellants completed the crime of conspiracy the minute they agreed among themselves to offer five billion dollars in collateral for a loan and took a step in furtherance of that plan using the mail or wires. In other words, even if they never actually influenced anyone they could still have been found guilty of the crime of conspiracy to commit mail or wire fraud.

. In other words, any misstep in calculating the Guidelines range was at most harmless error. See United States v. Jass, 569 F.3d 47, 68-69 (2d Cir.2009).