NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0504n.06

Case No. 20-6128

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 03, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| ROBERT DOGGART, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: SUTTON, Chief Judge; McKEAGUE and THAPAR, Circuit Judges.

SUTTON, Chief Judge. Robert Doggart returns to our court for a third time. His prosecution stems from events in 2014 and 2015, when he grew convinced that a community of 40 Muslim families residing in upstate New York were surreptitiously running a terrorist training ground. He now challenges his 120-month sentence. We affirm.

I.

Doggart first crossed the FBI's radar in 2015. After a failed run for Congress, he grew concerned about illegal immigration and terrorism. That concern evolved into a fixation with "jihadist camps," which he suspected were operating on American soil. R.285 at 36. Doggart eventually focused on a group of Muslim families living in a community called Islamberg. He came to believe, baselessly, that the residents were plotting a terrorist attack on New York City.

In an apparent attempt to recruit fellow travelers, he wrote on Facebook that Islamberg "must be utterly destroyed." R.14 at 2; R.232 at 5.

An FBI informant responded to his post. Doggart eventually told him on the phone that "those guys [have] to be killed. Their buildings need to be burnt down." R.14 at 3. Doggart later showed the informant a map of the real estate he intended to burn, including the town's mosque.

Doggart tried to recruit others, too. He traveled to Nashville, Tennessee, and Greenville, South Carolina, to meet sympathizers. An FBI wiretap revealed that Doggart discussed the specifics of his plan multiple times with multiple people. He contacted prospective "gunners" on Facebook. *Id.* at 4. And he scheduled April 15, 2015, as the "drop dead" date for the plot. *Id.* at 3.

On April 10, the FBI arrested him.

Doggart tried to plead guilty twice. But the district court rejected the plea agreement each time. The court first rejected Doggart's attempt to plead guilty to making a threat in interstate commerce on the ground that it lacked a sufficient factual basis. *United States v. Doggart* (*Doggart I*), 906 F.3d 506, 509 (6th Cir. 2018). A jury convicted Doggart, and he appealed the resulting two-count verdict. *Id.* We reversed. The district court abused its discretion when it refused the plea deal, we reasoned, because it relied on the wrong definition of "threat." *Id.* at 512.

On remand, Doggart and the government entered a new plea agreement. *United States v. Doggart* (*Doggart II*), 947 F.3d 879, 882 (6th Cir. 2020). The district court rejected it on the ground that it was too lenient, and the court reinstated the jury verdict. *Id.* Doggart appealed anew. *Id.* The district court did not abuse its discretion in rejecting this plea agreement, we held. *Id.* But we determined that one conviction—solicitation to commit federal arson—could not stand. *Id.* at 887. To prove that crime, the government had to establish that the targeted mosque was

2

"used in" interstate commerce or an activity affecting interstate commerce. 18 U.S.C. § 844(i). It was not. *Doggart II*, 947 F.3d at 887.

That left one count standing: solicitation to destroy religious property. The district court calculated a guidelines range of 51–63 months. The government moved for an upward departure. *See* U.S.S.G. § 3A1.4 cmt. n.4. Concluding that Doggart's offense "was calculated to influence or affect the conduct of government by intimidation or coercion," *id.*, the district court granted the motion. That increased Doggart's range to 324–405 months. The district court sentenced him to 120 months, the statutory maximum.

## II.

*The terrorism departure.* Doggart contests the district court's upward departure based on the terrorist nature of his conduct. Abuse-of-discretion review applies. *United States v. Potts*, 947 F.3d 357, 364 (6th Cir. 2020).

The terrorism guideline contains a mandatory adjustment provision and a discretionary departure provision in the commentary. The adjustment applies where "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). A "federal crime of terrorism" has two statutory elements. One concerns motivation: The offense must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). The other concerns the nature of the offense: It must violate one of a list of criminal provisions ranging from the production of biological weapons to the kidnapping of members of Congress. *Id.* § 2332b(g)(5)(B). The discretionary departure applies, as relevant here, to defendants who meet the motivation requirement but not the offense requirement. U.S.S.G. § 3A1.4 cmt. n.4.

The adjustment has stricter consequences than the departure does. It requires a district court to increase a defendant's base offense level significantly and assign him to the highest criminal history category. The departure provision says only that, if the defendant satisfies the motivation requirement, "an upward departure would be warranted." *Id.*

So long as this commentary does not conflict with the U.S. Constitution, a federal statute, or the text of the guidelines, a district court must consider it. *United States v. Flores*, 974 F.3d 763, 765 (6th Cir. 2020); *United States v. Donadeo*, 910 F.3d 886, 894 n.3 (6th Cir. 2018); *United States v. Greer*, 872 F.3d 790, 797 (6th Cir. 2017). But the ultimate decision to depart remains an exercise of discretion for the district court.

The district court hewed to this path. It correctly did not apply the adjustment, as the offenses enumerated in § 2332b(g)(5)(B) do not include Doggart's crime of conviction— solicitation to destroy religious property. At the same time, it concluded that Doggart's intentions fit the motivation requirement. The court elected to follow the guidance in the commentary and depart upward. At no point did it abuse its discretion.

Doggart raises several objections, none compelling. He first contests the commentary's validity, arguing it conflicts with an act of Congress. Before 1996, the adjustment applied where "the offense is a felony that involved, or was intended to promote, international terrorism." U.S.S.G. § 3A1.4 (1995). In that year, Congress defined a "federal crime of terrorism" in § 2332b(g)(5). Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 702, 110 Stat. 1214, 1293–94. Congress simultaneously instructed the Sentencing Commission to amend the "adjustment relating to international terrorism" so that it applies "only" to "Federal crimes of terrorism." *Id.* § 730, 110 Stat. at 1303. Doggart argues that a departure that applies without regard to offense conduct overlooks this directive.

But his contention overlooks a detail of its own—that the 1996 directive targeted the "adjustment relating to international terrorism." *Id.* The guideline did not contain a departure in 1996. Congress's instruction thus concerned the adjustment, not the departure, and the district court invoked only the departure.

Doggart persists that, when the Commission added the departure in 2002, it ran afoul of the 1996 directive. But the two do not conflict. The adjustment still requires a connection to a federal crime of terrorism. The departure does not. The departure's effects also differ from the adjustment's effects. Instead of prompting a mandatory increase in the guidelines range, the departure commentary alerts the district court that it may depart upward and treat an offender as severely as if the adjustment applied. That the discretionary departure provision applies to a broader range of offenses does not conflict with a directive constraining the mandatory adjustment's application.

In reality, Doggart protests, the departure is not discretionary; it is an adjustment by another name. The commentary, he notes, provides that where a defendant acts with the requisite motivation, "an upward departure would be warranted." U.S.S.G. § 3A1.4 cmt. n.4. But unlike the adjustment, the departure does not require a district court to do anything. "'Departure' is a term of art under the Guidelines," referring to a discretionary change in the guidelines. *Irizarry v. United States*, 553 U.S. 708, 714 (2008); *see United States v. Tristan-Madrigal*, 601 F.3d 629, 635 (6th Cir. 2010). The Commission has explained that, if a "guideline linguistically applies" but does not adequately capture the offense, a "court *may consider* whether a departure is warranted." U.S.S.G. ch. 1, pt. A, introductory cmt. n.4(b) (emphasis added).

Nor does this departure disguise an adjustment. True, the text of the commentary specifies that departure "would be warranted" (instead of "may be warranted") if the offense satisfies the

5

motivation requirement. But even when commentary provides that a "departure would be warranted," sentencing courts "retain a general discretion." *United States v. Stewart*, 917 F.2d 970, 973 (6th Cir. 1990) (quotation omitted). An observation that a departure "would be warranted," as case law confirms, conveys permission, not compulsion.

This analysis also takes care of Doggart's concern that the district court failed to respect *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc) (per curiam). There, the relevant guideline required an adjustment if a defendant had a prior conviction for a "controlled substance offense." *Id.* at 383–84. The guidelines' text provided a definition of "controlled substance offense" and the definition did not extend to attempt crimes. U.S.S.G. § 4B1.2(b). In commentary, the Commission expanded the definition to reach attempt crimes. *Havis*, 927 F.3d at 384. That posed a problem. While the guidelines' text undergoes congressional review and notice and comment, those "institutional constraints that make the Guidelines constitutional in the first place" do not apply to commentary. *Id.* at 386–87. Revision of guideline text by commentary thus does not work. *Id.* at 387.

But Doggart and Havis stand in different situations. The commentary containing the discretionary departure in this instance does not purport to "interpret the guideline" setting forth the adjustment. U.S.S.G. § 1B1.7. The commentary here serves the distinct purpose of "suggest[ing] circumstances which . . . may warrant departure." *Id.* It does not conflict with or alter the text of the guideline. That the Commission may not redefine a mandatory adjustment in the guidelines' text through commentary does not mean it may not identify grounds for a discretionary departure through commentary.

Even so, Doggart insists, the district court treated the terrorism departure as mandatory, noting that the district court said it "was bound by the guidelines themselves" to depart. R.357 at

33. But Doggart exaggerates, featuring a snippet of the sentencing hearing, removing it from the context in which it was said, and overlooking the court's other statements. In truth, the court said the terrorism departure was a policy-driven "suggestion[]" that the Commission provides in the context of "specific guidance for departure by analogy." *Id.* at 27. When the district court stated it was "bound" by the guidelines' framework with respect to the departure, all it meant was that the considerations that affect departures are different from those that inform variances under the § 3553(a) factors. Confirming the court's overall understanding of the discretionary nature of the departure, Doggart did not object to the cherry-picked statement he now features on appeal. No abuse of discretion occurred.

Even if that were not the case, the district court covered its bases. It explained that, even if it had not departed, it would have varied upward to the same degree. Any error in departing would be harmless anyway. *United States v. Klups*, 514 F.3d 532, 536 (6th Cir. 2008).

*Other procedural reasonableness arguments.* Doggart challenges the procedural reasonableness of his sentence on other grounds as well. Among other procedural obligations of a fair sentencing hearing, a district court must calculate the guidelines range correctly (as just noted), base the sentence on factual findings that are not clearly erroneous, consider a defendant's nonfrivolous arguments, and fairly explain its ultimate decision. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).

The district court fulfilled those responsibilities. It correctly calculated Doggart's range and made reasonable factual findings. Ample evidence supported its conclusions that Doggart solicited fellow Facebook users to burn down Islamberg's mosque and that he contemplated killing its residents. The court also reasonably concluded that Doggart knew nothing about his recruits, heightening the risk that Doggart would connect with even more maladjusted strangers and spur

7

even more violence. The court likewise reasonably assessed the enduring impact of Doggart's crime on the residents of Islamberg. It laid out its explanation, rejected Doggart's assertions that he posed no real threat, and explained why it was not moved by his expressions of remorse to lower his sentence. The court imposed a procedurally reasonable sentence.

Doggart's attempts to make inroads on this conclusion fail. He claims that the district court wanted to vary downward—to "give[] [him] credit for his stated remorse" and "other post-sentence conduct," R.357 at 92—but somehow never lowered the sentence below the statutory maximum of 120 months. Doggart misreads the district court. It did not state that it meant to vary downward from the guidelines range to "credit" Doggart. It simply acknowledged the crosscurrents that existed in this sentencing hearing (and in many sentencing hearings): that the court still believed a sentence in the "area" of 235 months (Doggart's original sentence) would be "appropriate"; that the halved statutory maximum no longer permitted such a sentence; and that, because of Doggart's positive post-sentencing conduct, it no longer felt "as strong in its views" that he endangered the public. *Id.* Through it all, the court settled on a 120-month sentence because it aptly balanced the competing considerations, not because it mistook his guidelines range by a factor of two and tried to vary downward.

Doggart invokes two Second Circuit cases that purport to show that the district court used an "unspecified higher range" as a "benchmark for an illusory downward variance." Appellant's Br. at 58. Neither case helps him. In each, the court of appeals found a procedural error after concluding that the lower court may not have realized that the statutory maximum capped the guidelines range. *United States v. Corsey*, 723 F.3d 366, 376 (2d Cir. 2013); *United States v. Dorvee*, 616 F.3d 174, 180–81 (2d Cir. 2010). That did not happen here. The district court recognized his 120-month guidelines range. It noted that a higher sentence might be appropriate,

but that Doggart's good behavior would cut in the opposite direction and that it could not impose such a sentence anyway. No mistaking of the range occurred.

Doggart separately claims that the district court failed to address sentencing disparities adequately because it did not engage with the data he presented about the sentences of similarly situated offenders. But the district court responded to the claim and concluded that his comparisons did not involve like-situated individuals. This argument, too, fails to provide any foothold for a reversal.

Doggart's remaining procedural objections, three in total, focus on the district court's conclusion that he poses a danger to the public. First, Doggart asserts that his "talk of destroying the mosque in Islamberg was contingent"—that he never planned to harm anything or anyone unless he found a terrorism training camp in the town upon his arrival. Appellant's Br. at 59. But that is faint comfort, as the district court reasonably concluded. Doggart had plans, and extensive plans at that, to wreak havoc on the town. He obtained maps of the mosque, cafeteria, and school that he wanted to burn. He told his sister, "[W]e will burn down their buildings." He said that he "would have the position of 'stand-off gunner' who could shoot any resistance at 350 yards." R.232 at 5. He discussed munitions, including assault rifles, explosives, night-vision equipment, and armor. Doggart may have described his operation as a reconnaissance trip. And he may have believed his plans were conditional. But the district court reasonably rejected any such explanation for lowering his sentence. Consider how far Doggart's plot progressed without one whit of evidence that the residents of Islamberg posed a risk in the first place. The district court had ample reason to be concerned.

Second, Doggart argues that violence was not imminent because he did not intend to proceed until he formed a lawful militia. That did not assuage the district court's fears either. In

rejecting this theory of leniency, the court stated (among other things) that it did not know of any "bureau of licensing for legal militias." R.357 at 83. Doggart now argues that "militia groups do register as non-profit organizations." Appellant's Br. at 62.

But nothing in the record suggests that this peripheral fact would have alleviated the district court's concerns or otherwise justifies another sentencing hearing. That militias sometimes register as nonprofits does not undermine the court's conclusion that Doggart had invented his envisioned regulatory scheme—a "well-organized militia" that was "recognized under the Constitution" and could "act[] with some authority." R.357 at 59. Status as a 501(c)(3) organization does not come with that perk.

Third, Doggart argues that the district court relied too heavily on its assessment of his dangerousness at his original sentencing in 2017. The court explained it could not "put completely out of mind" Doggart's 2017 statement that the reason for his prosecution "was because he was an old white male." *Id.* at 91–92. At the original sentencing, the court thought that this showed Doggart "really did not have any insight into his actions." *Id.* at 92. At the resentencing hearing, the court "still believe[d] that protecting the public" from Doggart's future crimes remained "relevant." *Id.* Doggart takes issue with the factual basis for the district court's concerns, noting his attorney used the phrase "old white guy" and he did not.

That the district court did not perfectly capture the words of a three-year-old sentencing proceeding does not require reversal. The court's broader point remained relevant, namely that in 2017 Doggart felt the legal system had wrongly maligned him and that he might reoffend because he did not appreciate what he had done. Doggart's 2017 statements confirm the legitimacy of that fear. He emphasized his belief that the "government targeted [his] demographic." R.293 at 167. His counsel confirmed that he believed prosecutors singled him out because "he is an old white

guy of the Christian religion." *Id.* at 188. He described what he'd done not as a serious crime but as an "elaborate hoax." *Id.* at 164. And he repeatedly expressed a lack of respect for the legal system. The district court was free to put Doggart's 2020 expressions of remorse in the context of his 2017 statements.

*Substantive reasonableness.* Doggart maintains that, even if his sentence is procedurally sound, it is still longer than it should be. He faces an uphill battle, as we give significant deference to the district court's assessment of whether a sentence is too lengthy or too brief. *Rayyan*, 885 F.3d at 442.

The district court reasonably sentenced Doggart to the statutory maximum. The district court had plenty of grounds for imposing this 120-month sentence. It found the underlying plan "atrocious," and it was disturbed that Doggart solicited participants without regard for their motivations or capabilities, increasing the risk that one of his recruits might be particularly dangerous or volatile. R.357 at 81–82. The court also sought to account for the "major" and "long-lasting" effect Doggart's actions had "on many, many people's lives." *Id.* at 90. It fairly worried that Doggart did not see the error in his ways and might not change his behavior going forward. All told, the court reasonably concluded that the seriousness of Doggart's offense, his risk of future violence, and his impact on his victims favored a maximum sentence.

Doggart claims that the departure unfairly treats him like someone who committed "assault with intent to commit murder." Appellant's Br. at 64. It does not. That crime has a higher base offense level and double the statutory maximum. *See* 18 U.S.C. § 113(a)(1); U.S.S.G. § 2A2.1(a); U.S.S.G. § 2X1.1(a).

Doggart circles back to the district court's reliance on his 2017 allocution. He argues the court was wrong to cite his lack of respect for the legal system as a reason to impose a higher

sentence. He points out that he neither disrespected nor criticized the judge, and that even if he had, contempt-of-court proceedings would have been the proper avenue for punishment. This argument sails wide of the district court's point. Doggart's dearth of respect for the justice system led the court to worry that he would feel no need to comply with the law in the future. That concern stemmed not from his behavior in court but his attitude in general. It was appropriate for the court to consider the need "to promote respect for the law" and the risk to the public of potential "further crimes" Doggart might commit. 18 U.S.C. § 3553(a)(2)(A), (C).

*Sixth Amendment*. That leaves one argument. Absent a jury finding that Doggart aimed to intimidate or coerce the government, he argues, his sentence violates the Sixth Amendment. Whatever the availability of this argument, *compare United States v. White*, 551 F.3d 381, 384–85 (6th Cir. 2008) (en banc), *with United States v. Bonick*, 711 F. App'x 292, 299 (6th Cir. 2017), it fails anyway. We can uphold his sentence without this factual finding. A few paragraphs back, we sustained the substantive reasonableness of Doggart's sentence, and we did so without relying on his motivation.

We affirm.